# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

JOHN WILLIAM CARRIGAN,

        Plaintiff,

    v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.

_____/

Case No.  1:13-cv-00458-SKO

**ORDER REGARDING PLAINTIFF'S COMPLAINT**

**(Docs. 20, 21, 22)**

## I.  BACKGROUND

Plaintiff John Carrigan ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 405(g), 1383(c)(3).  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  (Docs. 13, 14.)

## II.  FACTUAL BACKGROUND

Plaintiff was born in 1984, has completed some college, and previously worked as a customer service clerk, night auditor, laboratory assistant, and laborer.  (Administrative Record ("AR") 110-12, 199, 1184-85.)  Plaintiff began experiencing headaches, dizziness, abdominal pain, and other symptoms including mild depression on March 3, 2009.  (AR 264, 423, 515.)  On February 5, 2010, Plaintiff filed an application for DIB and SSI benefits.  (AR 199, 209.)

**A.      Relevant Medical History**

Plaintiff began experiencing headaches and dizziness after riding a rollercoaster at an amusement park on March 3, 2009.  (AR 264, 423, 489.)  On March 7, 2009, Plaintiff visited the emergency room regarding his symptoms.  (AR 423.)  Thereafter, Plaintiff sought regular treatment for dizziness, headaches, and nausea until early 2010, with sporadic treatment for the symptoms thereafter.  (AR 438-40, 448-49, 489, 496-97, 523, 527, 608, 649, 658, 666-67, 841-42, 1021-23.)  Initially, Plaintiff's treating doctors noted that his symptoms could be attributable to a viral infection.  (AR 438, 496, 523.)  In July 2011, a neuropsychological evaluation connected the symptoms to a mild brain injury Plaintiff sustained during a motor vehicle accident in 2002, which was potentially aggravated by the 2009 rollercoaster and exacerbated by emotional factors. (AR 1188.)  Treating doctors noted Plaintiff's symptoms were "very unusual," "atypical," or had no "good neurologic or organic explanation."  (AR 497, 658, 842.)

Plaintiff underwent multiple tests.  An electroencephalogram ("EEG"), magnetic resonance image ("MRI"), and computed tomography ("CT") scans of his brain showed normal results.  (AR 437, 440, 447, 658, 908.)  Physical examinations throughout the relevant period revealed normal neurological functioning, including motor skills, strength, reflexes, gait, and intact cranial nerves.  (AR 440, 479, 489, 496, 501, 527, 585, 622-23, 658, 811, 842, 1024-25.)

In addition to dizziness and headaches, Plaintiff reported the onset of mild to moderate depression in March 2009.  (AR 515.)  Plaintiff reported he had a history of anxiety and depression since he was a teenager.  (AR 508-09.)  Plaintiff attended group therapy, during which he reported doing well on medication and mood stabilization.  (AR 585, 599, 601.)  During

1  mental examinations, Plaintiff exhibited intact memory, normal concentration, good insight, and

2  unimpaired judgment.  (AR 362, 479, 509, 585, 652, 678-79, 838, 1026, 1064.)

3      Plaintiff's treating neurologist, Ramsis Benjamin, M.D., examined Plaintiff three times: on

4  December 9, 2009; February 2, 2010; and June 3, 2010.  Dr. Benjamin completed two statements

5  supporting Plaintiff's application for disability.  (AR 477, 841-42, 1174-76.)  In a January 28,

6  2010, letter, Dr. Benjamin stated that Plaintiff would be disabled for one year due to his difficulty

7  focusing, thinking, and performing certain cognitive tasks.  (AR 477.)  Dr. Benjamin stated

8  Plaintiff suffered from lapses of consciousness, periodic migraines, progressive depression, and

9  generalized anxiety disorder.  (AR 477.)  Also, Plaintiff had a possible seizure disorder.  (AR

10 477.)  In a June 3, 2010, medical source statement, Dr. Benjamin set forth Plaintiff's exertional

11 limitations, assessing Plaintiff would be limited to less than a sedentary range of work, with

12 additional work restrictions for alternating sitting and standing every 30 minutes, occasional

13 reaching and handling, a limited ability to see due to blurry vision, and no climbing, stooping or

14 crouching.  (AR 477, 1174-76.)

15     Plaintiff's treating psychiatrist, Alcira Sahami, M.D., started treating Plaintiff in

16 September 2009.  In April 2010, Dr. Sahami completed a short-form opinion noting that Plaintiff

17 appeared to make fair progress in therapy and responded well to Depakote, a prescription

18 medication, for mood stabilization.  (AR 678-80.)  Dr. Sahami indicated Plaintiff had unlimited

19 functioning in all mental categories.  (AR 681.)

20     On April 28, 2010, non-examining state agency physician Dr. Bugg reviewed Plaintiff's

21 medical records and completed a Physical Residual Functional Capacity Assessment.  (AR 682.)

22 Dr. Bugg opined Plaintiff could perform a medium range of work with seizure precautions, and

23 could occasionally lift 50 pounds, frequently lift 25 pounds, stand/walk about 6 hours in an 8-hour

24 work day, and sit about 6 hours in an 8-hour work day, with unlimited ability to push/pull.  (AR

25 683-90.)  Dr. Bugg further opined that Plaintiff was limited to occasional climbing and balancing

26 and frequent stopping, kneeling, crouching, and crawling.  (AR 684.)  Plaintiff did not have any

27 manipulative, visual, or communicative limitations, but must avoid even moderate exposure to

28 hazards such as machinery or heights.  (AR 685.)

1    Dr. Bugg noted Plaintiff's allegations were partially credible, but the degree of functional

2    limitations alleged was not supported by the physical/mental findings.  (AR 690.)  Dr. Bugg also

3    indicated Plaintiff needed to be reevaluated after a psychological review; it was possible that a

4    combination of mental and physical impairments could render Plaintiff disabled from all work.

5    (AR 690.)

6    On November 3, 2010, non-examining state agency physician Dr. Frye also reviewed

7    Plaintiff's medical records and completed a Physical Residual Functional Capacity Assessment.

8    (AR 888-95.)  Dr. Frye affirmed Dr. Bugg's assessment that Plaintiff could perform medium-

9    exertion work with seizure precautions, and could occasionally lift 50 pounds, frequently lift 25

10   pounds, stand/walk about 6 hours in an 8-hour work day, sit about 6 hours in an 8-hour work day,

11   with unlimited ability to push/pull.  (AR 888, 895.)  Like Dr. Bugg, Dr. Frye opined that Plaintiff

12   was limited to occasional climbing and balancing and frequent stooping, kneeling, crouching, and

13   crawling.   (AR 890.)   Plaintiff did not have any manipulative, visual, or communicative

14   limitations, but must avoid even moderate exposure to hazards such as machinery or heights.  (AR

15   890.)

16   **B.**    **Administrative Proceedings**

17   The Commissioner denied Plaintiff's SSI and DIB applications initially and again on

18   reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge

19   ("ALJ").  (AR 121-22, 126-27, 136, 141-42.)  On November 8, 2011, the ALJ held a hearing

20   during which Plaintiff testified, represented by counsel.  (AR 50-120.)

21      **1.**    **Plaintiff's Testimony**

22   Plaintiff appeared at the hearing held on November 8, 2011.[1]  (AR 52-92.)  Plaintiff stated

23   he became disabled in March 2009, but then worked part-time for Target for four or five months

24   in 2011.  (AR 54-59.)

25   Plaintiff testified that in 2009 he abused Vicodin to treat back pain, but once his

26   prescription was finished he never procured any more Vicodin.   (AR 59-60.)   Plaintiff

27   _____

28   [1] Plaintiff does not rely on any hearing testimony in his opening brief.  (AR 4.)

4

participated in Kaiser Permanente's group therapy for depression, anxiety, and drug use in early 2010 for several weeks.  (AR 62-63.)  In 2011 Plaintiff used two ibuprofen to control back pain, which he needed only every two or three weeks.  (AR 75-76.)  He also had a Percocet prescription, but it had been at least six months since he had taken any; he avoided it because of his previous abuse of Vicodin.  *Id.*  Plaintiff only drank alcohol in Las Vegas with his bowling league once or twice a year, but not since 2008, and had never been told he was an alcoholic. (AR 64.)

Plaintiff testified he was in a motorcycle accident in 2002, during which he sustained a head injury which resulted in problems with memory.  (AR 65.)   However, only after he rode a rollercoaster did his symptoms of dizziness or collapsing begin.  (AR 65.)  Plaintiff was unclear if the rollercoaster ride and the onset of his dizziness occurred in 2008 or 2009, but believed the rollercoaster ride caused the onset of troubles with balancing and motion sickness.  (AR 65-67.)

Plaintiff testified that no doctor had found anything abnormal with his ears.  (AR 67.)  All his tests, including MRIs and CTs, were negative for any conditions which would explain his symptoms.  (AR 67.)  However, his two neurologists, a neuropsychiatrist, and his primary care doctor told him his fluctuating high blood pressure may be causing vertigo, or that he had "a kind of migraine" headache problem.  (AR 67-68.)  Even when his blood pressure was normal, he suffered from dizziness spells three to five times a week, each lasting seconds to a minute, and during which he may fall down.  (AR 68-69.)  Prior to an episode of dizziness he felt lethargic and weak.  (AR 69.)  He also experienced temporary hearing loss when he was about to pass out. (AR 79.)

Plaintiff testified he was hearing voices at the end of 2009, which ceased about six months after he stopped taking Celexa and Ambien.  (AR 71.)  His doctors prescribed Depakote, which helped with some symptoms such as migraines and depression, but he did not know if it helped with the voices or hallucinations.  (AR 71-72.)  Plaintiff's depression was not controlled; once he got depressed he fell into "a severe depressed mode," becoming suicidal and a social recluse despite taking Depakote.  (AR 72.)  Plaintiff had anxiety between eight and sixteen hours per day, triggered by social phobia.  (AR 80.)  He experienced paranoia from 2009 to present.  (AR 108.)

1  Plaintiff had difficulty following verbal directions and was unable to keep up in college

2  courses.  (AR 84-85.)  As a result, his neurologist approved him having note takers and taking

3  extra time on tests.  (AR 85.)  Plaintiff also testified the side effects of Depakote included hair

4  loss and even more difficulty concentrating.  (AR 85.)  Plaintiff's sleep diminished since riding

5  the rollercoaster, averaging four to five hours nightly, and sometimes no sleep for days.  (AR 86.)

6  Plaintiff suffered from migraines which would bring him to his knees and impact his

7  vision almost daily in 2009 and 2010, and from three to six days of the week for at least two

8  hours, in 2011.  (AR 88.)  He had fainting episodes three or four times in the past 12 months.

9  (AR 106.)  The episodes lasted 30 to 45 minutes.  (AR 107.)  Plaintiff emailed his neurologist to

10 report the spells.  (AR 106.)

11  Finally, Plaintiff had gastrointestinal ("GI") problems, including irritable bowel syndrome

12 which caused him to have to use the restroom frequently, and had been seeing a GI specialist.

13 (AR 108-09.)

14  **2.  Medical Expert Testimony**

15  Hershel Goren, M.D., testified telephonically at the hearing as a medical expert.  (AR 92.)

16 Dr. Hershel testified that, based solely on Plaintiff's medical records and nothing in the hearing,

17 Plaintiff had five medically determinable impairments of asthma, vertigo, cognitive disorder,

18 generalized anxiety disorder, and major depressive disorder.  (AR 92.)  However, Plaintiff's

19 problems did not meet or equal any listing from the Listing of Impairments ("Listing"), 20 C.F.R.

20 404, Subpart P, App. 1.  *Id.* §§ 404.1520(d), 416.920(d).

21  Dr. Hershel opined Plaintiff would be able to work full time with non-exertional

22 restrictions.  (AR 92.)  Plaintiff could never use ladders, ropes, scaffolds, or complete other

23 balancing tasks.  (AR 94.)  Environmental restrictions included avoiding extreme heat,

24 concentrated humidity, and unprotected heights.  (AR 94.)  Plaintiff's mental restrictions included

25 having only superficial interactions with supervisors, coworkers, and the general public; being

26 limited to non-complex tasks; and undertaking jobs without high stress such as production quotas.

27 (AR 94.)

28

### 3. Vocational Expert Testimony

Linda Ferra, a vocational expert ("VE"), testified at the hearing.  (AR 110-19.)  Relying upon the Dictionary of Occupational Titles ("DOT"), Ms. Ferra testified that Plaintiff's past jobs were best classified as a laboratory assistant, night auditor, customer service clerk, and medical store laborer.  (AR 110-12.)

The ALJ presented the VE with several hypotheticals.  In the first hypothetical, the ALJ asked the VE to assume a hypothetical person of the same age, education, and experience as Plaintiff, who has the ability to work at an unrestricted exertional level, but with seizure precautions.  (AR 113.)  Seizure precautions include no climbing ladders, ropes, and scaffolds; no balancing; no work at heights, unprotected heights, or being around hazardous moving machinery; and no extreme heat or humidity.  (AR 114.)  Mentally, the hypothetical person would have the capacity to perform simple and detailed work, but not complex work.  (AR 114.) Finally, the hypothetical person would have the capacity to work around others, but limited to superficial interactions that are not detailed, confrontational, or entail being responsible for the safety of others.  (AR 114.)  Finally, the hypothetical person would have to avoid high production quotas and work at high stress levels.  (AR 114.)

The VE replied that the hypothetical person would be able to perform Plaintiff's past work of laboratory assistant, but could not perform Plaintiff's other past work.  (AR 115.)  In addition to Plaintiff's past work, the ALJ asked whether any other work could be completed by the hypothetical person, and the VE replied that the hypothetical person could also work as a housekeeping cleaner, cashier, and parking lot attendant.  (AR 115.)

Plaintiff's counsel posed a second hypothetical, asking the VE to consider all the same factors in the first hypothetical, but adding the non-exertional limitations that one-third of the day the hypothetical person's ability to concentrate, persistence and pace would be moderately impaired.  In addition, counsel added that the hypothetical person's memory, adaptation skills, and ability to understand would be moderately impaired for one-third of the day.  (AR 116.)

In response to this second hypothetical, the VE stated none of Plaintiff's past work would be available, because the combination of the moderate impairments would preclude performing

work competitively.  (AR 116.)   Counsel then asked the VE if each of the moderate impairments precludes any jobs by itself, or only in conjunction.  (AR 117.)   The VE testified that if the hypothetical person were limited by any of the moderate impairments for one-third of the day, all of Plaintiff's past relevant work would be precluded.  (AR 117.)

Plaintiff's counsel then posed a third hypothetical, adding to the first hypothetical a need for the person to take unscheduled breaks from two to six hours long on each of three to six days per week.  (AR 117.)   The VE stated that the third hypothetical person would not be able to perform any job, because they would require excessive absence from work.  (AR 118.)

**C.      The ALJ's Decision**

The ALJ determined Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of March 3, 2009.  (AR 18, ¶ 2.)  The ALJ also found Plaintiff suffers from the severe impairments of asthma, vertigo, cognitive disorder, major depressive disorder, general anxiety disorder, and obesity.  (AR 18, ¶ 3.)  The ALJ concluded that Plaintiff's severe impairments do not, either individually or in combination, meet or equal any condition listed in the Listing.  (AR 19, ¶ 4.)

The ALJ further determined that Plaintiff retained the Residual Functional Capacity ("RFC")[2] to perform a full range of work at all exertional levels, but with seizure precautions due to claimed vertigo and dizziness.  (AR 20.)  The ALJ assessed Plaintiff cannot climb ladders, ropes, or scaffolds; balance; or work around industrial hazards (unprotected heights or hazardous moving machinery).  (AR 20-21.)  Also, Plaintiff must avoid extreme heat and humidity.  (AR 21.) Plaintiff can perform tasks ranging from simple through detailed, but not complex, work. (AR 21.)  Further, Plaintiff can work around supervisors, coworkers, and the general public under normal stress, but must be limited to superficial, nonsupervisory, non-confrontational capacities

---

[2] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  Social Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

that are not high stress.  (AR 21.)  Based on testimony from the VE, the ALJ decided Plaintiff could perform his past relevant work of laboratory assistant.  (AR 26.)  In the alternative, the ALJ relied on the VE's testimony to find Plaintiff could perform other jobs that exist in significant numbers in the national economy, such as a housekeeper/cleaner, cashier, or parking lot attendant. (AR 26-27.)

On November 29, 2011, the ALJ concluded that, based on the testimony of the VE and considering Plaintiff's age, education, work experience, and residual functioning capacity, Plaintiff had not been disabled from March 3, 2009, when Plaintiff filed his application for DIB, through the date of the ALJ's decision.  (AR 27.)

Plaintiff sought review of this decision before the Appeals Council, and the Appeals Council denied the request for review.  (AR 4.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 416.1481.

**D.      Plaintiff's Contention on Appeal**

On March 29, 2010, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision.  Plaintiff contends that the ALJ failed to properly evaluate the opinion of Dr. Benjamin as a treating physician.  (Doc. 20.)

### III.  SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings.  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007); *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.")

"Substantial evidence is more than a mere scintilla but less than a preponderance."  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## IV.  APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).  The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy.   42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability.   In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.    20 C.F.R. §§ 404.1520(b), 416.920(b).  If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities.  *Id.* §§ 404.1520(c), 416.920(c).  If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing.  If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity ("RFC") despite the impairment or various limitations to perform her past work.  *Id.* §§ 404.1520(f),

416.920(f).  If not, in the Fifth Step, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy.  *Id.* §§ 404.1520(g), 416.920(g).  If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps.  *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V.  DISCUSSION

Plaintiff claims the ALJ failed to properly evaluate Dr. Benjamin's opinions from January and June 2010, which are the bases for Plaintiff's disability.  (Doc. 20, 3.)  Because Dr. Benjamin is a treating physician, Plaintiff asserts his opinion was entitled to special weight.  (Doc. 20, 7.)  Plaintiff contends that because Dr. Benjamin's opinions are contradicted by other physicians, the ALJ was required to articulate specific and legitimate reasons for rejecting Dr. Benjamin's opinions, but failed to do so.  (Doc. 20, 7-8.)  Plaintiff contends the ALJ's proffered reasons for rejecting Dr. Benjamin's opinion were not valid. (Doc. 20, 8-9.)

The Commissioner responds that the ALJ cited substantial evidence contradicting the validity of Dr. Benjamin's opinions.  (Doc. 21, 5.)

**A.**    **The ALJ's Consideration of the Medical Evidence**

**1.**    **Legal Standards Pertaining to Opinions of Treating Physicians**

"By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians."  *Orn v. Astrue,* 495 F.3d 625, 631 (9th Cir. 2007). "If a treating physician's opinion is 'well-supported . . . and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight."  *Id.*  Even if a treating physician's opinion is not given controlling weight, the opinion is still entitled to deference and the ALJ must consider specified factors in determining the weight it will be given, including (1) the length of the treatment relationship and the frequency of examination, and (2) the nature and extent of the treatment relationship.  *Id.*  Additional factors relevant in evaluating the weight of any medical opinion, not just treating physician opinions, include: (3) the amount of relevant evidence that supports the opinion and the quality of the explanation provided, (4) the consistency of the medical opinion with the record as a whole, (5) the specialty of the physician providing the

opinion, (6) and other factors such as the degree of understanding a physician has of Social Security disability programs and their evidentiary requirements and the physician's familiarity with other information in the record. *Id.*

If a treating physician's opinion is not contradicted by another doctor, it may only be rejected for clear and convincing reasons supported by substantial evidence. *Id.* at 632 (quoting *Reddick v. Chater,* 157 F.3d 715, 725 (9th Cir. 1998)). Even if the treating physician's opinion is contradicted by another doctor, it may not be rejected unless the ALJ provides specific and legitimate reasons supported by substantial evidence. *Id.* (quoting *Reddick,* 157 F.3d at 725).

### 2. The ALJ Provided Specific and Legitimate Reasons to Reject Dr. Benjamin's January 2010 Letter

In his January 28, 2010, letter, Dr. Benjamin stated Plaintiff had been under his care since December 2009. (AR 477.) He explained Plaintiff's conditions of persistent oscillopsia, frequent vertigo, lapses of consciousness, periodic migraine headaches, progressive depression, and generalized anxiety disorder had debilitated Plaintiff, and the possibility of seizure disorder also existed. (AR 477.) Plaintiff had difficulty focusing, thinking, performing certain cognitive tasks, and was unable to drive because of his variable illnesses as well as the medications prescribed. (AR 477.)   Although Plaintiff was being treated medically, his symptoms were controlled minimally at best. (AR 477.) Dr. Benjamin assessed that disability for one year was appropriate until Plaintiff's symptoms were better managed. (AR 477.)

In his decision, the ALJ stated he gave Dr. Benjamin's January 2010 letter little weight, underscoring that the letter was written in January 2010, and Plaintiff first saw Dr. Benjamin the preceding month in December 2009. (AR 24.) The ALJ reasoned that "it would be difficult for the doctor to give an accurate opinion after treating the [Plaintiff] for a short period of time." (AR 24.) The ALJ further noted the January letter opined Plaintiff was disabled for a year, yet Dr. Benjamin did not refresh his opinion after a year, and therefore the opinion was stale. (AR 24.) Additionally, Plaintiff did not seek to renew the disabled placard after a year, which tended to indicate those limitations no longer existed. (AR 24.)

### a.   The ALJ May Discredit Dr. Benjamin's Opinion Based on Length of Treating Relationship

Plaintiff claims the ALJ improperly discredited Dr. Benjamin's opinion based on his brief treating relationship with Plaintiff.  Plaintiff argues that Dr. Benjamin's opinion is entitled to heavy weight as part of a treatment team, because he had available to him the "voluminous" treatment records to ascertain the nature of Plaintiff's disability.  (Doc. 20, 9.)

The Commissioner responds that the ALJ's decision cited substantial evidence contradicting the validity of Dr. Benjamin's opinion.  (Doc. 21, 5.)

The length of a treating relationship is a specific and legitimate reason to reject a treating physician and give the physician's opinion less weight.  20 C.F.R.  §§ 404.1527(c)(2); 416.927(c)(2).  The weight given a treating physician's opinion depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record.  *Id*.  As stated above, if a treating physician's opinion is contradicted by other physicians' opinions, it may be rejected if the ALJ makes findings setting forth specific and legitimate reasons that are based on the substantial evidence of record.  *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989); *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987).

Here, Dr. Benjamin's opinion of Plaintiff's mental functioning was contradicted by treating psychiatrist Dr. Sahami, and the ALJ was required to state specific and legitimate reasons to discredit his opinion.  *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995).

### i.   The record established Dr. Benjamin saw Plaintiff only one time prior to declaring Plaintiff disabled a month later.

The factors identified in *Orn* and in 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2) support the ALJ's decision to afford little weight to Dr. Benjamin's opinions because of the length of his treating relationship with the Plaintiff.  Plaintiff had only one examination with Dr. Benjamin prior to the doctor authoring the letter declaring Plaintiff disabled for a year.  Also, as noted by the ALJ, the overall length of the treatment relationship prior to Dr. Benjamin's letter was very short (approximately one month).  In total, Dr. Benjamin saw Plaintiff three times over seven

months.  The ALJ did not err in discrediting Dr. Benjamin based on his very abbreviated treating relationship with Plaintiff.

Plaintiff cites *Benton v. Barnhart*, in which the court found that because the claimant's psychiatrist oversaw the claimant's treatment team, he was entitled to the weight of a treating physician even though he had seen the claimant only once.  331 F.3d 1030 (9th Cir. 2003) (finding psychiatrist was entitled to weight of a treating doctor when the psychiatrist (1) was transmitting both his own knowledge and that of a medical treatment team under his supervision, (2) had the opportunity to direct and communicate the treatment team over time, and (3) continually consulted with claimant's other therapists).

This case is distinguishable from *Benton*.  While Dr. Benjamin noted, "I have reviewed the Medical/Surgical and Family history as displayed in HealthConnect . . . ,"[3] and that he would also review "the recent MRI of the brain," nothing in the record indicates Dr. Benjamin relied upon any of Plaintiff's records or interacted with any of Plaintiff's other doctors.  (AR 489.) Plaintiff's medical records with Kaiser Permanente begin in May 2006, but until 2009 they do not include treatment for the symptomology and conditions for which Plaintiff saw Dr. Benjamin. (AR 707-92, 904-1170.)  Thus, it is unclear how these records would have provided further insight into Plaintiff's conditions and symptoms reported to Dr. Benjamin.  Further, the record does not suggest Dr. Benjamin supervised any of Plaintiff's other doctors or collaborated with them to reach his January 2010 opinion.  While Dr. Benjamin was part of the Kaiser Permanente network, Plaintiff points to no evidence supporting the contention that Dr. Benjamin actually worked as a team with Plaintiff's other doctors.  Further, Plaintiff points to no evidence that Dr. Benjamin consulted on Plaintiff's treatment to such an extent that his opinion qualifies as one from a treatment team or that Dr. Benjamin otherwise had a longitudinal picture of Plaintiff's conditions, despite his short treatment history with Plaintiff.

---

[3] HealthConnect is Kaiser Permanente's national electronic medical record system, which integrates a member's clinical record with appointments, registration, recent lab results, prescriptions, email correspondence with doctors, and billing.  *See* Kaiser Permanente: Fresno, Selma, Clovis, and Oakhurst, http://mydoctor.kaiserpermanente.org/ncal/facilities/region/fresno/area_master/about_us (last visited April 21, 2014).

1    Moreover, the ALJ properly afforded great weight to Dr. Sahami's more current April

2  2010 opinion, which contradicted Dr. Benjamin's January 2010 assessment of Plaintiff's

3  cognitive functions.  An ALJ's decision to discredit a doctor's opinion because it is contradicted

4  by a more current opinion constitutes substantial evidence.  *See Rushing v. Astrue*, 360 F. App'x

5  781, 782 (9th Cir. 2009) (finding an ALJ's decision to discredit portions of a doctor's Medical

6  Source Statement was supported by the specific, legitimate reason that the Statement was

7  inconsistent with medical opinions made later in time); *Bayliss v. Barnhart,* 427 F.3d 1211, 1216

8  (9th Cir. 2005).

9    Plaintiff's treating psychiatrist, Dr. Sahami, saw Plaintiff over a longer period of time

10  than did Dr. Benjamin, and gave her opinion more than two months after Dr. Benjamin's January

11  2010 letter.  (AR 25.)  Dr. Sahami completed a short-form opinion noting that Plaintiff appeared

12  to make fair progress in therapy and had responded well to Depakote for mood stabilization since

13  she started seeing Plaintiff in September 2009.  (AR 678-80.)  Dr. Sahami indicated Plaintiff was

14  oriented in all spheres, had intact concentration, normal memory, and average intelligence.  (AR

15  679.)   Notably, Dr. Sahami also indicated Plaintiff had unlimited functioning in all mental

16  categories.  (AR 681.)  In contrast, Dr. Benjamin's opinions regarding Plaintiff's limitations were

17  markedly more restrictive than those provided by Dr. Sahami.

18    The ALJ gave Dr. Sahami's opinion great weight because it was substantiated by the

19  medical evidence and because Dr. Sahami was well-versed in the assessment of functionality as

20  related to the disability provisions of the Social Security Act and regulations.  (AR 25.)  The ALJ

21  reasonably gave more deference to the treating doctor who had a longer treating relationship with

22  Plaintiff than Dr. Benjamin.

23    Finally, Plaintiff contends it was inconsistent for the ALJ to reject Dr. Benjamin's opinion

24  due to the short duration of his treating relationship, while crediting non-examining doctors Bugg

25  and Frye, who had no treating relationship with Plaintiff at all.  (Doc. 20, 8.)  This argument is not

26  persuasive.  The ALJ did not reject Dr. Benjamin's opinion in exchange for these non-examining

27  doctors.  Instead, the ALJ afforded Dr. Bugg and Dr. Frye's opinions little weight because they

28  were not consistent with the medical record.  The ALJ did, however, credit the portion of Dr.

1   Frye's opinion outlining Plaintiff's exertional limitations, to which he gave substantial weight

2   because it aligned with Plaintiff's need for seizure precautions.   (AR 24.)   Thus, the ALJ's

3   treatment of the doctors was not inconsistent.

4            **b.      The ALJ Properly Discredited Dr. Benjamin's January 2010 Opinion
             When It Was Not Renewed After Its Expiration**
5

6        The ALJ also discredited Dr. Benjamin's opinion in part because, although the January

7   letter stated Plaintiff was disabled for a year, Dr. Benjamin did not submit any follow-up letter

8   after one year to update Plaintiff's status, rendering the opinion stale.   (AR 24.)   The ALJ also

9   noted Plaintiff did not renew his disabled placard, for which Dr. Benjamin initially outlined

10  Plaintiff's functional limitations, which suggested those limitations no longer existed.  (AR 24.)

11       Plaintiff asserts that because the ALJ made no findings that Plaintiff's condition had

12  improved, or specified other changes that necessitated an update regarding Plaintiff's health, he

13  improperly discredited Dr. Benjamin's January 2010 opinion.  (Doc. 20, 8.)  The Commissioner

14  responds that because the January 2010 letter conflicted with subsequent medical opinions, it was

15  reasonable for the ALJ to award the opinion little weight.  (Doc. 21, 5.)

16       The limited temporal scope of Dr. Benjamin's opinion was a legally sufficient reason to

17  reject the January 2010 letter, and the ALJ's reasoning in this regard is supported by the record.

18  After the January 2010 letter, Plaintiff submitted to mental status examinations during which he

19  exhibited intact memory, normal concentration, good insight, and unimpaired judgment.  (AR

20  362, 479, 509, 585, 652, 678-79, 838, 1026, 1062.)  In a February 2010 report, Dr. Benjamin

21  himself noted Plaintiff was "doing better than before," and Plaintiff's "mood had improved."

22  (AR 622-23.)  Dr. Benjamin also recorded Plaintiff's mood, memory, affect, and judgment as

23  normal.  (AR 622-23.)  Notably, Plaintiff stated during an examination in March 2011 that he had

24  not renewed his disability placard because he was "doing fine" after it expired.   (AR 908.)

25  Additionally, Dr. Benjamin never completed a follow-up opinion updating Plaintiff's mental

26  functioning.  (AR 24.)

27       The ALJ inferred from this that Dr. Benjamin's January 2010 opinion did not accurately

28  capture Plaintiff's limitations.  This inference is supported by Plaintiff's conduct, his statements,

1   and by subsequent medical evidence.  It is permissible for the ALJ to make inferences reasonably

2   drawn from the record.  *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004).

3   Thus, Dr. Benjamin's failure to update his assessment of Plaintiff after his original opinion

4   expired was a proper basis for the ALJ to give the January 2010 opinion less weight.

5              **c.      Conclusion**

6        In sum, the ALJ provided specific and legitimate reasons to discredit Dr. Benjamin's

7   January 2010 opinion.  Dr. Benjamin's treating relationship with Plaintiff was very brief – one

8   visit in one month – prior to authoring the letter.  Furthermore Dr. Benjamin's opinion was not

9   updated after its expiration date, and Plaintiff did not reapply for the disability placard, from

10  which the ALJ reasonably inferred the limitations about which Dr. Benjamin opined were no

11  longer supported.

12       **3.      The ALJ Properly Afforded Little Weight to Dr. Benjamin's June 2010
                   Medical Source Statement Based on Plaintiff's Daily Activities**

13

14        On June 3, 2010, Dr. Benjamin completed a medical source statement indicating Plaintiff

15  was limited by exertional limitations of occasionally lifting less than 10 pounds, frequently lifting

16  less than 10 pounds, standing or walking less than 2 hours in an 8-hour workday, and sitting less

17  than 6 hours in an 8-hour workday, with the need to alternate standing and sitting every 30

18  minutes.  (AR 1175-76.)  The medical source statement indicated Plaintiff could never climb,

19  stoop, or crouch, but could occasionally balance, kneel, and crawl.  (AR 1175.)  Plaintiff could

20  constantly feel with both hands, frequently finger with both hands, and occasionally reach or

21  handle.  (AR 1175.)  He had limited vision in both eyes due to blurring and photosensitivity, and

22  unlimited ability to hear or speak.  (AR 1175.)  Plaintiff had environmental restrictions against

23  heights, moving machinery, temperature extremes, chemicals, and dust.  (AR 1176.)

24        The ALJ afforded Dr. Benjamin's June 3, 2010, medical source statement little weight.

25  (AR 24.)  He explained, "[Plaintiff's] trip to Disneyland shows that he is able to walk around an

26  amusement park for the whole day and, likely, to engage in some entertainment rides even though

27  he claims that such rides cause him severe vertigo."  (AR 24.)

28

17

1    Plaintiff argues the ALJ erred in affording little weight to Dr. Benjamin's June 3, 2010,

2  opinion regarding Plaintiff's physical impairments and limitations.  (Doc. 20, 9.)  Plaintiff asserts

3  that rejecting Dr. Benjamin's opinion solely because of his trip to Disneyland is not specific and

4  legitimate.  (Doc. 20, 9.)

5    The Commissioner responds that the ALJ noted Plaintiff engaged in various activities

6  undermining the alleged disability, and the record lacked overall support for Dr. Benjamin's June

7  2010 statement; therefore the ALJ did not err in discrediting it based on Plaintiff's activities.

8  (Doc. 21, 5-6.)  The Commissioner also contends the trip to Disneyland negates Plaintiff's

9  allegations of social phobia and vertigo.  (Doc. 21, 7.)

10    Plaintiff's trip to Disneyland was referenced within Dr. Benjamin's Call Documentation

11  completed on September 27, 2010 ("[Plaintiff] was at Disneyland on August 23 and toward the

12  end of the day he began to have shooting pain from the right back to the heel.").  (AR 1070.)

13  Based on Plaintiff's trip, the ALJ noted Plaintiff was able to walk for a large part of the day and

14  possibly partake in rides.  (AR 24.)   While the ALJ specifically discussed Plaintiff's trip to

15  Disneyland as a basis for discrediting Dr. Benjamin's June 2010 statement, he also discussed the

16  nature of Plaintiff's other activities.  (AR 22-23.)  Plaintiff described his daily activities as class

17  work (AR 21, 585, 615, 908, 1060, 1184), chores (AR 278), and errands such as feeding the dog

18  or going shopping (AR 277), which were not limited to an extent congruent with his alleged

19  symptoms and limitations.  (AR 23.)  Plaintiff also worked 15-19 hours at Target Department

20  Store as a stock clerk for four or five months after the onset of his symptoms.  (AR 22, 55.)

21    The ALJ reasonably found the probative value of Dr. Benjamin's opinion about Plaintiff's

22  exertional limitations was eroded by the scope and extent of Plaintiff's activities.  *Magallanes v.*

23  *Bowen*, 881 F.2d at 755 (explaining that the ALJ need not recite "magic words," and that a

24  reviewing court may draw inferences relevant to the ALJ's analysis of the evidence "if those

25  inferences are there to be drawn").  The inconsistency between Dr. Benjamin's January 2010

26  opinion and Plaintiff's activities is a specific and legitimate reason to give less weight to Dr.

27  Benjamin's opinion. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (not improper to

28

1 | reject an opinion largely based on inconsistencies between the opinion and the medical record or a

2 | claimant's daily activities).

3 | Notably, the ALJ did not silently reject Plaintiff's limitations as opined by Dr. Benjamin,

4 | but determined that activities such as Plaintiff's college coursework – performed over the time

5 | frame of Plaintiff's alleged disability – undercut the physician's findings.  This is an appropriate

6 | basis to reject the opinions of the doctors.  For example, in *Rollins v. Massanari*, 261 F.3d 853,

7 | 856 (9th Cir. 2001), the court held that the ALJ permissibly rejected a treating physician's opinion

8 | of disability that was inconsistent with the claimant's level of activity.  Specifically, the physician

9 | had opined that the claimant's disability precluded her from engaging in any bending, stooping,

10 | crouching, crawling, kneeling, climbing, and balancing and she was never to be exposed to smoke,

11 | fumes, dust, temperature extremes, humidity, vibrations, or noise, among other things.  *Id*.  The

12 | court observed there was no basis in the opinion for these restrictions, the claimant had never

13 | asserted any problem with many of the areas of limitation, and the limitations were inconsistent

14 | with the level of activity that the claimant engaged in by maintaining a household and raising two

15 | young children with no significant assistance from her ex-husband.

16 | Similarly, in *Bayliss v. Barhnart*, the claimant maintained that the ALJ improperly rejected

17 | the opinion of a physician who opined that the claimant had difficulty paying attention,

18 | concentrating, and organizing herself without getting overwhelmed.  427 F.3d at 1216.  While the

19 | ALJ agreed with the physician's conclusion, the ALJ determined that these limitations would not

20 | affect the claimant's ability to work because the limitations had not precluded her from completing

21 | high school, obtaining a college degree, finishing a Certified Nurses' Aide training program, and

22 | participating in military training.  *Id*.  The court concluded that this evidence supported the ALJ's

23 | determination that such limitations did not preclude Plaintiff from work.  *Id*.

24 | Analogous to both *Rollins* and *Bayliss*, the ALJ here concluded that Plaintiff's success in

25 | his course work, job at Target, failure to renew his disabled parking placard because he did not

26 | need it, and his trip to Disneyland, despite the severe exertional limitations outlined by Dr.

27 | Benjamin, warranted rejection of the physician's opinion.  While the ALJ did not specifically

28 | reference all of Plaintiff's daily activities in rejecting Dr. Benjamin's opinion, the ALJ discussed

the scope of Plaintiff's daily activities at length in assessing Plaintiff's credibility.   The ALJ's discussion of Plaintiff's trip to Disneyland as a basis to reject Dr. Benjamin's opinion indicates the ALJ considered the scope of and extent of Plaintiff's activities in assessing the opinion. *Magallanes,* 881 F.2d at 755 ("[W]e are not deprived of our faculties for drawing specific and legitimate inferences from the ALJ's opinion . . . if those inferences are there to be drawn."). Although the trip to Disneyland in and of itself is not necessarily sufficient to discredit Dr. Benjamin's opinion because of the lack of details about the trip, this was only one activity in a broader range of activities that the ALJ explicitly discussed.   *Id.* (ALJ is not required to recite "magic words" in explaining the decision).   In sum, the nature and scope of Plaintiff's activities were a specific and legitimate reason to discredit Dr. Benjamin's opinion that Plaintiff was unable to lift more than 10 pounds, stand or walk more than 2 hours in an 8-hour workday, and sit more than 6 hours in an 8-hour workday, with a need to alternate standing and sitting every 30 minutes, in addition to environmental precautions. *See Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001); see also *Batson*, 359 F.3d at 1193 ("Under [the substantial evidence] standard, the Commissioner's findings are upheld if supported by inferences reasonably drawn from the record.").

      For the above reasons, the Court finds that the ALJ made specific and legitimate findings based on substantial evidence of record for finding Plaintiff's alleged limitations did not comport with the limitations described by Dr. Benjamin.   The Court concludes the ALJ did not err in discrediting Dr. Benjamin's June 2010 opinion.

///

///

///

///

///

///

///

///

# VI.  CONCLUSION AND ORDER

Based on the foregoing, the Court finds the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, and against Plaintiff John Carrigan.

IT IS SO ORDERED.

Dated:   **April 29, 2014**                              **/s/ Sheila K. Oberto**
                                        UNITED STATES MAGISTRATE JUDGE